THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LEON L. FENDERSON, Defendant-Appellant.

Fifth District No. 5—85—0707

Opinion filed June 19, 1987.

538

540

Daniel M. Kirwan and E. Joyce Randolph, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Kathleen Alling, State's Attorney, of Mt. Vernon (Kenneth R. Boyle, Stephen E. Norris, and Gerry R. Arnold, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HARRISON delivered the opinion of the court:

Defendant, Leon L. Fenderson, was convicted after a jury trial in the circuit court of Jefferson County of murder and concealment of a homicidal death. He was sentenced to concurrent prison terms of natural life for murder and five years for concealment of a homicidal death. On appeal he contends (1) he was not proved guilty beyond a reasonable doubt on the concealment charge, (2) the court erred in admitting evidence of another crime committed by defendant, (3) the court erred in admitting into evidence statements made by the victim to police at the time of an earlier physical confrontation with defendant, (4) he was prejudiced by the prosecutor's reference to defendant in closing argument as an "animal" who chose to live off the support of others, (5) the court erred in refusing to give the jury the second paragraph of the circumstantial evidence instruction, (6) the court erred in failing to instruct the jury on involuntary manslaughter, and (7) the court relied on improper aggravating factors in sentencing. These seven issues are raised in a brief prepared by the office of the State Appellate Defender. Defendant has also filed a *pro se* brief raising additional issues. He contends he received ineffective assistance of counsel in that his attorneys failed to investigate his mental illness as a possible defense and that the court erred in allowing the State to amend the indictment. For the reasons which follow, we reverse defendant's conviction and sentence for concealment of a homicidal death and affirm his conviction and sentence for murder.

Defendant was accused of murdering Mary Rhodes on May 1,

1985. Her body was found in a shower stall in Room 16 of the Lawrence Motel in Mount Vernon by paramedics who responded to a call made by defendant.

The State introduced into evidence statements made by defendant to police on the morning of May 2, 1985. Defendant gave them a lengthy statement which was transcribed by Sergeant Steve Lamar of the Mount Vernon police department, and this written statement was signed by defendant. In this statement, defendant told police he and Rhodes had been living in Room 16 at the Lawrence Motel. They had been in Mount Vernon for about two weeks. Since July of 1984, Rhodes had been working as a prostitute for defendant, and most recently she had been working as a prostitute at a truck stop in Mount Vernon. On May 1, defendant was at the motel working on his car. He and Rhodes talked about Rhodes' "turning tricks" at the truck stop, with Rhodes saying she wanted to get there early because the police arrive around 11 p.m. Defendant stated that both he and Rhodes had been drinking during the course of the day and that Rhodes "had gotten drunk." Between 7 and 8 p.m., defendant left the motel to go to a discount store, and he also bought a pint of rum at a liquor store. From there he went to the "project area" in hopes of buying marijuana. He returned to the motel, where he and Rhodes again discussed her activities as a prostitute. They drank rum, then both went to sleep on the bed. They awoke approximately an hour later. Rhodes was on the floor, a "little drunk" and a "little drowsy," according to defendant. He told her it was about time for her to go to the truck stop. Defendant poured water on her, telling her she was "getting a free shower." Rhodes then went into the shower and defendant could hear the water running. He went back to sleep. Between 11:30 p.m. and midnight, defendant awoke to hear the shower still running. Steam filled the room. He found Rhodes on the floor of the shower, her skin peeling. He knew she was dead. He talked on the phone with his Aunt Wanda and Leroy McCall, then called an ambulance and the police. He had told McCall that it appeared Rhodes "fell in the shower." Also in this written statement, defendant stated he broke one of the chairs in the room that morning while he was jumping on it.

Sergeant Lamar, in addition to testifying regarding the written statement, also testified that after the written statement had been completed, defendant commented he had slapped Rhodes twice and kicked her once on the night she died.

Jerry Volkert, a detective captain with the Mount Vernon police department, testified he questioned defendant in the early hours of May 2, prior to the taking of the written statement. Volkert's testimony of

what defendant told him was generally consistent with the written statement. However, defendant told Volkert he had never struck Rhodes. When Volkert asked defendant if it could be possible someone had been in the room that night, defendant replied in the negative, explaining he was a light sleeper.

The State's evidence also included testimony from Frank Cooper, a crime-scene supervisor for the Illinois State Police, who testified that he observed the victim's body in the shower stall. The victim's outer layer of skin on her face, neck, upper torso and arms was "loose." Cooper also observed blood on the bedding, carpeting and a wall and saw a "gouge" on one wall. He testified that this mark on the wall was consistent with having been made by the leg of the chair found by the dumpster. Cooper further stated that the cold water supply to the shower was in working order.

John Richardson, a deputy coroner, arrived at the scene approximately 40 minutes after defendant called for an ambulance. Richardson testified he observed the victim's body in the shower, and that the victim appeared to be scalded over 20 to 25% of her body, with the skin peeling on her head, shoulders and elbows. Richardson testified that the body evidenced signs of rigor mortis, explaining that heat accelerates this process. He also observed blood on the rug, on the bed, and in the shower stall. Richardson did not notice any water in the shower area.

Andrew Wist, a forensic scientist with the Illinois State Police, testified that he performed tests on the bloodstains found on the bedspread, sheets and carpeting taken from Room 16, and also tested blood found on a jacket and pants belonging to defendant. The tests on the stains on the jacket were inconclusive, but Wist testified that the blood on all the other items could have come from the victim but could not have come from defendant. Wist further testified that the way blood was splattered on defendant's jacket indicated a struggle may have taken place.

Dr. Victoria Nosovitsky, who performed an autopsy on the victim's body, testified that the cause of death was blunt trauma to her head, causing hemorrhaging in the brain. She found evidence of several severe blows to the victim's head. Dr. Nosovitsky also testified there were signs of hemorrhages in the victim's chest and legs, and found that two ribs were broken. The injuries did not cause immediate death, according to Dr. Nosovitsky. She found that Rhodes suffered second-degree burns on 20% of her body, but that these burns did not cause the death. She believed the burning of the skin occurred or at least began while the victim was still alive. Dr. Nosovitsky testified that the

burns concealed some of the superficial evidence of the injuries.

Kisher Patel, the business manager at the Lawrence Motel, testified defendant and a woman checked into the motel on April 17, 1985, and were assigned to Room 16. They checked out on April 23, but returned on April 24, and were again given Room 16. Patel testified he personally cleaned the room on April 23 and saw no blood on the floor or gouges on the wall. At approximately 3 p.m. on May 1, the victim came to the motel office to get some soap. Patel noticed nothing unusual about her at that time. The victim called the office at approximately 5:30 p.m. to inquire about the charge for a long-distance phone call she had made. Patel noticed nothing unusual about her voice. He testified that on May 2, when he went to Room 16, he observed on a wall a mark which was not there when he cleaned on April 23 and also found that one of two white chairs normally in the room was missing. Police showed Patel a broken white chair found near a dumpster on the motel grounds, which Patel identified as having come from Room 16. In other testimony, Patel stated he never saw defendant and the victim fighting. He had seen defendant near defendant's car at approximately 7 p.m. on the evening of May 1, and he appeared normal at that time.

Wanda Smith, an aunt of defendant's, testified defendant called her sometime after 10 p.m. on May 1. He told her he thought Rhodes was dead. Mrs. Smith told defendant to call an ambulance. She testified that defendant told her he had gone out to a liquor store and that Rhodes was going to take a shower. When he returned, he heard water running and lay down on the bed. He later awoke to see steam coming from the shower, and discovered the victim's body.

Two police officers from Champaign, Illinois, were allowed to testify over defendant's objection. Pat Bennett testified that he received a call on January 3, 1985, to go to a liquor store. There he found Mary Rhodes on the floor, with her face covered with blood. Rhodes was in a dazed condition and spitting up blood. Later while at a hospital, Rhodes told Officer Bennett that she had argued with defendant over whether she would go "back to work on the street," and that defendant struck her in the face three times. Rhodes made this statement "about at least a half an hour" after coming out of her dazed condition, according to Bennett. Bennett was at the hospital for approximately 45 minutes. He further testified that he knew Rhodes to be a prostitute. Officer Gene Stephens testified regarding the same incident. He stated that defendant reported to police that Rhodes had attacked him and threatened to kill him. Defendant told Stephens that Rhodes was in the backseat of a car and he was in the front seat when

she attacked him. Defendant stated that when he freed her arm from around his neck, he turned around and punched Rhodes several times in the face. Defendant told Stephens, "You got to keep that bitch in line." Stephens testified that defendant had alcohol on his breath during this conversation.

Defendant testified in his own behalf. He denied killing Rhodes. He denied any specific knowledge she was a prostitute and denied ever taking money from her. He also testified, "I didn't beat Mary that night," but admitted he had slapped her on previous occasions. While he stated he and Rhodes had discussed "whether she was going to do something," he denied having a physical argument with her that evening. Defendant did state he had thrown a chair in the room against a wall twice and admitted placing this chair at the dumpster that evening. He remembered also that he had helped Rhodes into the shower and turned on one of the water faucets for her. He stated that in light of what occurred, he must have turned on the hot water. Defendant also testified he had been drinking that evening and that the shock over what had occurred, combined with the alcohol, contributed to the content of the statements he made to police.

Defendant first argues he was not proved guilty beyond a reasonable doubt of the offense of concealment of a homicidal death. Defendant specifically contends that because the State's theory of concealment was that defendant scalded the victim's body in order to conceal the injuries which caused the death, and because the evidence indicates Rhodes was not dead when the scalding occurred, that he cannot be found guilty of concealment of a homicidal death. He argues that the offense of concealment of a homicidal death requires that the victim be dead at the time of the act of concealment.

A criminal statute must be strictly construed in favor of an accused, and nothing is to be taken by implication against him beyond the obvious or literal meaning of such statutes. (*People v. Lutz* (1978), 73 Ill. 2d 204, 212-13, 383 N.E.2d 171, 174.) Section 9—3.1(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—3.1(a)) provides: "A person commits the offense of concealment of homicidal death when he conceals the death of any other person with knowledge that such other person has died by homicidal means." This court has stated that the statute contains two elements which must be established: "knowledge that a homicidal death had occurred, and some affirmative act of concealment of the death by the defendant." (*People v. Franklin* (1985), 130 Ill. App. 3d 514, 519, 474 N.E.2d 776, 780.) We believe the statute requires that the victim be deceased at the time of the concealment, because it requires that the act of concealment occur

"with knowledge" the person "has died." Also, *Franklin* states that there must be knowledge a homicidal death "had occurred." In *Franklin*, the defendant, who had been convicted of concealment of a homicidal death, argued that the evidence failed to establish the victim was dead at the time the body was placed in a bag, removed from a tavern, and thrown into the back of a pickup truck. We concluded: "Our review of the evidence leads us to the conclusion that there was sufficient circumstantial evidence from which the jury could infer that the victim was dead when his body was concealed and removed from the tavern and that the defendant was guilty of concealing a homicidal death." (130 Ill. App. 3d 514, 521-22, 474 N.E.2d 776, 782.) While we did not expressly hold that the act of concealment must occur after the victim has died, the decision in *Franklin* can be interpreted as assuming that this is the law. We also note that the jury in the present case was instructed, in conformity with Illinois Pattern Jury Instruction, Criminal, No. 7.12 (2d ed. 1981), that to find defendant guilty of concealment of a homicidal death, it would have to find the following:

"FIRST: That the defendant performed acts which concealed the death of Mary E. Rhodes; and

SECOND: That *when* the defendant did so he knew that Mary E. Rhodes had died by homicidal means." (Emphasis added.)

■ In the present case, the only evidence regarding the time of death came from Dr. Nosovitsky, who testified that Rhodes was alive when the scalding from the hot water occurred or at least when it began, although the victim may have been unconscious. There was no evidence that the victim had died prior to being placed in the shower. Therefore, defendant's conviction and sentence for concealment of a homicidal death must be reversed.

■■ Defendant also argues that the court erred in admitting evidence of a confrontation between defendant and Rhodes in Champaign which occurred on January 3, 1985, approximately four months before the offenses at issue here. Defendant contends this evidence was used solely to demonstrate his propensity to commit crime.

Evidence of other crimes may be admitted if for some purpose other than to establish the defendant's propensity to commit crime. (*People v. King* (1986), 109 Ill. 2d 514, 530, 488 N.E.2d 949, 958, *cert. denied* (1986), 479 U.S. ___, 93 L. Ed. 2d 173, 107 S. Ct. 249.) The evidence of the incident in Champaign was admissible here for the permissible purposes of showing *modus operandi* and motive. (See *People v. Stewart* (1984), 105 Ill. 2d 22, 61-62, 473 N.E.2d 840, 860, *cert. denied* (1985), 471 U.S. 1131, 86 L. Ed. 2d 283, 105 S. Ct. 2666.) The

evidence of the prior incident showed that defendant struck Rhodes in the face in an argument over whether she would continue working "on the street." Defendant had been drinking at the time of the earlier incident. The evidence of what occurred on May 1, 1985, showed defendant and Rhodes had been discussing her activities as a prostitute, defendant had been drinking, and Rhodes was struck repeatedly in the face.

■■ ■ Defendant next contends that even if evidence of this incident in Champaign on January 3, 1985, is relevant, the State should not have been able to use the victim's statement to police at the time of that incident as it would be hearsay. The State introduced testimony of Champaign police officer Pat Bennett, who stated the victim told him defendant had punched her in the face for refusing to go back out on the streets. The State argues that Bennett's testimony regarding the victim's statement was admissible under an exception to the hearsay rule for spontaneous declarations.

For statements to be admitted under the spontaneous declaration exception to the hearsay rule, there must be (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement, (2) absence of time to fabricate, and (3) the statement must relate to the circumstances of the occurrence. (*People v. Sanchez* (1982), 105 Ill. App. 3d 488, 491, 434 N.E.2d 395, 397.) Clearly the victim's statement to Officer Bennett met the first and third requirements. She had been struck three times in the face, leaving her bloody and in a dazed condition. The statement clearly related to the circumstances of the occurrence. Defendant argues that because the victim's statements were made at least half an hour after she came out of her dazed state, she had sufficient time to reflect upon the circumstances and to fabricate a false story about what occurred. We disagree. Time alone does not control the admissibility of the utterance, but rather the critical factor is the lack of opportunity to fabricate. (105 Ill. App. 3d 488, 491-92, 434 N.E.2d 395, 398.) Courts have found that statements made even several hours after the startling events can be admitted under the spontaneous declaration exception. (See *People v. Chatman* (1982), 110 Ill. App. 3d 19, 26, 441 N.E.2d 1292, 1298; *People v. Robinson* (1981), 94 Ill. App. 3d 304, 310, 418 N.E.2d 899, 903-04.) In the present case, the statement was made in a hospital approximately half an hour after the victim had come out of a dazed condition. She was being treated for injuries which caused her to bleed heavily. Therefore, we believe Officer Bennett could properly testify as to the statement made to him by Rhodes on January 3, 1985.

■■ Defendant next argues he was denied a fair trial because the

prosecutor in closing argument referred to him as an "animal" who chose to live off the support of others. While referring to a defendant as an "animal" may be improper, courts have found such error to be harmless (see *People v. Alexander* (1984), 127 Ill. App. 3d 1007, 1014, 470 N.E.2d 1071, 1077, *cert. denied* (1985), 471 U.S. 1019, 85 L. Ed. 2d 308, 105 S. Ct. 2027; *People v. Balls* (1981), 95 Ill. App. 3d 70, 77, 419 N.E.2d 571, 577), and we find no reversible error here. The prosecutor's comment regarding defendant's living off the support of others is based upon the evidence that the victim worked for defendant as a prostitute and consequently was not impermissible.

██ The next issue raised by defendant is easily resolved. He contends the court erred in refusing to give the second paragraph of the circumstantial evidence instruction (Illinois Pattern Jury Instructions, Criminal, No. 3.02 (2d ed. 1981)). Our supreme court has determined in *People v. Bryant* (1986), 113 Ill. 2d 497, 512, 499 N.E.2d 413, 420, decided after defendant was tried, that the second paragraph of the instruction is "obscure and misleading" and should not be given. Defendant acknowledges the holding in *Bryant* but argues it should not be applied retroactively to him. This contention is without merit. The supreme court found the instruction to be "obscure and misleading," and the instruction possessed these inadequacies at the time defendant was tried. (See *People v. Reynolds* (1987), 152 Ill. App. 3d 216, 219, 504 N.E.2d 163, 165.) Failure to give this misleading instruction to the jury could not have prejudiced defendant. We also note that the supreme court, in a supervisory order, has recently applied *Bryant* to reverse a decision of this court predating *Bryant* which had ordered a new trial where this instruction had not been given. See *People v. Oliver* (1986), 113 Ill. 2d 566, 499 N.E.2d 946, reversing 141 Ill. App. 3d 583, 490 N.E.2d 1072.

██ ██ Defendant next contends the court erred in failing to instruct the jury on involuntary manslaughter, arguing such an instruction was justified because there was evidence defendant had been drinking on the day in question and that he had a low tolerance for alcohol. We note that defendant did not request the jury be instructed on the involuntary intoxication defense (Ill. Rev. Stat. 1985, ch. 38, par. 6—3).

Involuntary manslaughter is committed by one who "unintentionally kills an individual without lawful justification *** if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly." (Ill. Rev. Stat. 1985, ch. 38, par. 9—3(a).) A person acts recklessly when he "consciously disregards a substantial

and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." Ill. Rev. Stat. 1985, ch. 38, par. 4—6.

An involuntary manslaughter instruction should not be given if there is no evidence which would reduce the crime to manslaughter. (*People v. Ward* (1984), 101 Ill. 2d 443, 451, 463 N.E.2d 696, 699.) As in *Ward*, there was no evidence here that defendant acted recklessly. His own testimony was that he did not cause the victim's injuries which resulted in her death. If the jury believed defendant's testimony, he would have been found not guilty of murder. (See 101 Ill. 2d 443, 451, 463 N.E.2d 696, 700.) Moreover, the severity of the victim's injuries negates any suggestion that defendant's conduct was only reckless. (101 Ill. 2d 443, 451, 463 N.E.2d 696, 700.) Therefore, the court did not err in refusing to instruct the jury on involuntary manslaughter.

Defendant also contends the trial court relied upon improper aggravating factors in sentencing him to natural life for murder. Specifically he contends the court considered serious harm to the victim as an aggravating factor and that since serious harm is inherent in every murder, the court improperly considered that factor. Defendant relies upon the recent case of *People v. Saldivar* (1986), 113 Ill. 2d 256, 497 N.E.2d 1138, where the supreme court found that the trial court had improperly relied upon the death of the victim as an aggravating factor in sentencing a defendant convicted of voluntary manslaughter because death is always an element of voluntary manslaughter. However, the court also found that it is permissible for the trial court, in applying the statutory aggravating factor that the defendant's conduct caused serious harm to the victim (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(a)(1)), to consider the force employed and the physical manner in which the victim's death was brought about. *People v. Saldivar* (1986), 113 Ill. 2d 256, 271, 497 N.E.2d 1138, 1141.

Defendant's argument is misdirected. The court could not and did not sentence him to a term of natural life by finding his conduct caused serious harm. Section 5—8—1(a)(1) of the Unified Code of Corrections (Code) (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)) allows for a term of natural life in murder cases in limited situations. The provision applicable here provides that "if the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty," the court "may sentence the defendant to a term of natural life imprisonment." (Ill. Rev. Stat. 1985, ch. 38,

par. 1005—8—1(a)(1)(b).) We believe the record indicates the trial court relied upon this provision to impose the sentence of natural life and was justified in doing so.

 ██ In the present case, the trial court at the sentencing hearing stated:

> "There is no question she was beaten to death. The doctor who did the autopsy testified that there were at least three major blows to the head causing blood hemorrhaging of the brain which caused her death and that she was probably put in the shower before she was dead and had she gotten prompt medical attention at the time of the blows, perhaps her life could have been saved.
>
> * * *
>
> She did suffer, according to the autopsies, two broken ribs and massive bleeding in the brain area suffered—caused by at least three major blows to the head. Putting it bluntly, she was beaten to death because she didn't want that night to go out and prostitute.
>
> The court feels under those conditions that it was a heinous crime and that it did entail exceptionally brutal conduct to the victim, Mary, and that this Defendant has some prior convictions although of a minor nature up until this time. But a sentence is necessary to compel others or to prevent others from committing like offenses and that this offense, of course, did cause serious bodily harm enough to kill the lady.
>
> * * *
>
> The Court must reiterate that it was exceptional brutality. It was a heinous crime considering the way she was killed and the surrounding circumstances being put in the shower and having turned on the scalding water."

We believe the trial court's remarks, when viewed in their entirety, make it clear that the trial court was invoking section 5—8—1(a)(1), finding defendant's conduct exceptionally brutal and heinous. Defendant relies on the offhand statement by the court that defendant, "of course, did cause serious bodily harm enough to kill the lady." We cannot accept defendant's argument that this statement was the foundation for the sentence of natural life. In determining whether a sentence was improperly imposed, a reviewing court should not focus on a few words or statements of the trial court, but, rather, the determination of whether or not the sentence was improper must be made by considering the entire record as a whole. (*People v. Ward* (1986), 113 Ill. 2d 516, 526-27, 499 N.E.2d422, 426; *cert. denied* (1987), 479 U.S.

_____, 94 L. Ed. 2d 168, 107 S. Ct.1314.) The record indicates the trial court was aware of the limits of section 5—8—1 and could not sentence defendant to natural life for reasons other than those provided.

■■■ We also find the record sufficient to support a finding that the "murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." The victim had been beaten to death, having been struck repeatedly on her head and chest. Two ribs were broken. After being severely beaten but while still alive, she was placed in a shower under hot water which caused second-degree burns. We conclude the court could properly sentence defendant to a term of natural life under section 5—8—1 of the Code.

■■■ We also reject defendant's other arguments regarding sentencing. He contends the court improperly relied upon deterrence as an aggravating factor while failing to consider his rehabilitative potential as a mitigating factor. The determination and imposition of sentence are within the trial court's discretion and a reviewing court may not substitute its judgment for that of the trial court absent an abuse of discretion. (*People v. Crete* (1986), 113 Ill. 2d 156, 164, 497 N.E.2d 751, 755.) The court here was free to weigh the relevant factors, and we find no abuse of discretion in the sentence of natural life on the murder conviction.

■■■ While we have reversed defendant's conviction for concealment of a homicidal death, there is nothing in the record to indicate that this conviction influenced the court in sentencing defendant for murder. (See *People v. Smith* (1984), 124 Ill. App. 3d 805, 813, 465 N.E.2d 101, 107.) The sentence of natural life is affirmed.

■■■ Having reviewed each point raised in the brief prepared by the State Appellate Defender, we now turn to defendant's *pro se* brief. Defendant first contends he was prejudiced by ineffective assistance of counsel in that his two attorneys failed to fully and conscientiously investigate "his background," and that if they had, they would have found he had a history of mental illness. He asserts in his brief that he was diagnosed as having schizophrenia in 1971 and 1976. The presentence report indicates that Wanda Smith, defendant's aunt, reported that defendant had been hospitalized for a nervous breakdown but the presentence report does not indicate when this occurred. Defendant seems to argue both that he was unfit to stand trial and that his mental illness would have served as a defense to the crimes charged.

Under section 104—10 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 104—10), defendant must show he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense in order to prove he is unfit to

stand trial. Defendant displayed knowledge of criminal proceedings in general, as well as knowledge of the specific proceedings against him. Defendant testified in detail at trial about the events of the day in question. We cannot conclude defendant was prejudiced by ineffective assistance of counsel because we cannot say there was a *bona fide* doubt of defendant's competency to stand trial. See *People v. Holman* (1983), 115 Ill. App. 3d 60, 65, 450 N.E.2d 432, 435.

■■ We likewise find nothing in the record to indicate counsel were incompetent in that they failed to raise the defense of insanity. As the State argues, defendant's conduct at the time of the offense demonstrates his understanding his conduct was unlawful. There was evidence he attempted to conceal the victim's injuries and to conceal the chair which the evidence indicated could have been the instrument used to kill the victim. Furthermore, defendant testified in great detail regarding events on the night Rhodes died. Moreover, defendant's contention in his *pro se* brief that his attorneys would have discovered "he could have been mentally ill" is mere conjecture. (See *People v. Balfour* (1986), 148 Ill. App. 3d 215, 228, 498 N.E.2d 547, 557.) Even if we were to accept assertions that he was diagnosed as schizophrenic in 1971 and 1976, he has pointed to nothing in the record to indicate the state of his mental health on May 1, 1985.

■■ Defendant has failed to demonstrate that the performance of counsel failed to meet an objective standard of reasonable competence or that any deficiencies were sufficiently serious to establish a reasonable probability that, but for counsel's professional inadequacy, the result of the proceeding would have been different. (See *People v. Walker* (1985), 109 Ill. 2d 484, 503, 488 N.E.2d 529, 537, *cert. denied* (1986), 479 U.S. ____, 93 L. Ed. 2d 598, 107 S. Ct. 598.) We note that defendant requested and received the benefit of two separate public defenders appointed by the court. We cannot conclude defendant was denied effective assistance of counsel.

We have reviewed other matters raised in defendant's *pro se* brief and have found them to be without merit.

For the foregoing reasons, defendant's conviction and sentence for murder are affirmed. Defendant's conviction and sentence for concealment of a homicidal death are reversed.

Affirmed in part and reversed in part.

WELCH and KASSERMAN, JJ., concur.