THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ANTONIO SANTAMARIA, Defendant-Appellant.
Third District   No. 3—86—0374

Opinion filed October 26, 1987.—Rehearing denied March 3, 1988.

Stephen Omolecki, of State Appellate Defender's Office, of Ottawa, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Raymond Kimbell II, State's Attorney, of Galesburg (Vincenzo Chimera and Michael A. Ficaro, Assistant Attorneys General, of Chicago, and Mark L. Rotert, Assistant Attorney General, of Springfield, of counsel), for the People.

JUSTICE STOUDER delivered the opinion of the court:

The defendant, Antonio Santamaria, was found guilty by a jury of murdering his wife, in violation of section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1), and of concealment of a homicidal death, in violation of section 9—3.1 of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 9—3.1). Santamaria was sentenced to concurrent terms of natural life imprisonment for the murder and five years for the concealment of the homicidal death. He appeals his conviction and sentence on the following grounds: (1) that the trial court erred in not granting his challenge for cause of a juror on the

basis that the juror initially stated he had already formed an opinion that the defendant was guilty; (2) that he was deprived of a fair trial when the prosecutor insinuated that he had inquired about a burial vault for his wife prior to the killing and then failed to present any evidence in support; (3) that the trial court erroneously considered, as a statutory factor in aggravation for sentencing, that his conduct caused serious harm to his wife since such harm is implicit in every offense of murder; and (4) that the trial court abused its discretion in imposing a sentence of natural life imprisonment for the murder in light of his accomplishments in life, lack of any prior criminal record, and that the offense was the result of circumstances unlikely to recur.

The defendant was a doctor of medicine educated in Mexico but not licensed to practice in the United States. His wife, Delia, was employed at a nursing home and worked the evening shift. On August 10, 1985, she had a conversation with another nurse in which she disclosed that she would be seeking a divorce from Santamaria. A letter from Delia's attorney reached Santamaria on August 9. During the conversation, Delia stated, "Well, Susan, the papers are in the mail. I don't know what he'll do." Delia was scheduled to work the next day but failed to show. Because she was normally a punctual employee, her supervisor called the Santamaria house to determine her whereabouts. The defendant answered the phone and when questioned, stated that Delia was in Chicago and then abruptly hung up. Delia also failed to show up to work on August 12. The nursing home administrator telephoned the house. When she inquired about Delia, she was told she had gone to North Carolina and then that she went to Chicago. When the administrator told Santamaria that she would contact the police if she did not hear from Delia in an hour, Santamaria stated, "I would rather have you wait three or four days."

On the day that the conversation took place with the nursing home administrator, a next door neighbor witnessed Santamaria, who seldom worked in his garden, digging a hole. The hole was approximately 1 to 1½ feet deep. The neighbor observed Santamaria filling this hole the next day and smoothing it over.

Also on August 12, Delia's attorney received a letter from Santamaria. The letter, dated August 10, stated that Santamaria and his wife were going to attempt a reconciliation. Santamaria stated in the letter that he had written because his wife was embarrassed since she had started and then stopped the proceedings several times in the past. Arguments about the rearing of the children had often oc-

curred during the marriage. Santamaria had discussed divorce with one of his sons on August 10. According to his son, Santamaria said he would rather murder Delia and kill himself than get divorced.

On August 10, Santamaria awoke when his sons came home at approximately 4:30 a.m. After he had talked to them briefly, he went upstairs, where he saw Delia standing at her bedroom door. He told her it was because of her permissiveness that the boys often came home drunk or on drugs. Santamaria stated that Delia then became "ugly" and responded that the boys had the right to do as they wished. Santamaria then stated that they should stop talking and go to bed. They then went to their respective rooms, which were across the hall from each other.

Santamaria stated that he fell asleep and later awoke to a noise and found his wife standing over him with a knife in her hand. A struggle ensued which took them from his bedroom to her bedroom and finally into the bathroom. Santamaria stated that he tried to knock his wife out with his fist, had hit her several times, but that she managed to hold onto the knife. During the struggle, Delia was cut on the neck. Finally, Santamaria pushed his wife backward, causing her to fall backwards and hit her head against the bathtub. It was at this point that the defendant cut his wife's throat, then put the rest of the body into the bathtub, disarticulated the body into 15 pieces, and removed the heart, liver, pancreas, kidneys, intestinal tract, and a large portion of the left lung.

Santamaria wrapped each of the 15 pieces in white linen. He buried the torso, legs, and feet in a hole he had dug in the basement and the head, arms, and hands in the hole that was dug in the garden. A plumber testified at trial that, while working in the Santamaria house in early August, he had noticed the hole in the basement and that it was covered with a door at that time.

Galesburg police started an investigation on August 13 as a result of a missing person report filed on Delia. They went to the house and talked with the defendant, who stated he did not know where she was. Police obtained a photo and checked various train and bus stations with no results. They also checked the nursing home and discovered that Delia had still not reported for work. The police returned to the home the following day and talked with two of Santamaria's sons. Delia's car and car keys and her purse with driver's license, make-up, and checkbook were still at the house. Delia never left home without her purse. Based on information from one of the sons, police obtained a search warrant for the Santamaria house.

The police executed the warrant and found that the door to De-

lia's room from the hallway had been secured with a bicycle lock. The door from her room to the bathroom was also secured. Upon gaining access to Delia's room, the police found clothing which appeared to be stained with blood on a hanger. A search of the basement revealed the first traces of Delia's body. One of the officers noticed an area where the floor bricks had been removed. He started to dig until his shovel hit something which felt soft and spongy. Then he proceeded to dig by hand. About 1½ feet down he felt skin. He brushed the dirt aside and discovered the upper torso minus the head and arms. At this point, the search was stopped and the Illinois State Police were called in.

A crime scene technician for the State police arrived and continued the search. He completed the search and retrieved the contents of the basement site. The technician then proceeded to the garden area, where he found the remaining body parts, including the head, which had the facial skin trimmed off. Dental records were used to establish the identity. Another search of the bedroom uncovered a black-handled fillet knife and another knife in a shoebox on Santamaria's bookshelf. The search continued the next day with the aid of an Illinois State Police serologist. The police discovered human blood spattered on the walls and floor of Delia's bedroom and the bathroom.

After the search the first day, police officers proceeded to Cottage Hospital, where Santamaria had been admitted as a patient. They informed him that they had found Delia's body. The defendant responded, "I knew you would." Santamaria was arrested pursuant to an arrest warrant. The defendant drew diagrams of where he had buried the pieces of the body. He also stated to the police, as he had similarly stated to his son, that he would rather see Delia dead than see his name in the paper connected to a divorce. An inventory of the defendant's personal belongings revealed receipts and refund slips for a meat grinder, spatula, and meat cleaver from a restaurant supply company and for a Sears food processor. These items were recovered by police the following day. The food processor was tested and traces of human blood and hair were found. It was determined that the hair and blood could have come from Delia but not the defendant.

The exact cause of death could not be determined. The pathologist testified that the body parts were neatly severed at the joints, or disarticulated, and that the person who did it had to have had a degree of anatomical knowledge. He also stated that the stab wounds were consistent with the black-handled fillet knife found in the house.

During cross-examination, Santamaria testified that in August 1985, he went to a place to look for a container for dog feces. The prosecutor then asked if he had gone to a "burial vault company" to do this. The defendant objected and moved for a mistrial. The motion for mistrial was denied but the trial court sustained the objection and instructed the jury to disregard the term "burial vault." Subsequently, the trial court ruled that all testimony relating to the visit to the vault company would be stricken since the prosecution failed to establish whether it occurred before or after Delia's death.

The jury found Santamaria guilty and the court sentenced him to natural life imprisonment for the murder and to five years for the concealment of a homicidal death. In pronouncing sentence, the court noted, as factors in mitigation, no prior criminal history and the fact that the conduct was a result of circumstances not likely to recur. The defendant's age of 67 years and his accomplishments were also noted.

In aggravation, the court found that the defendant caused serious bodily injury to another in that he caused his wife's death. It also pointed to the exceptionally brutal and heinous behavior, which was indicative of wanton cruelty.

▓▓ ▓ The first issue we consider on this appeal concerns the trial court's alleged error in permitting Mr. Olomon to serve as a juror. Notwithstanding Mr. Olomon's answers during the *voir dire* which indicated that he would be impartial, Santamaria contends that Olomon's preconceived notion of his guilt was enough to deny him a fair trial.

Prior to trial, at the *voir dire* of prospective jurors, three of the first panel of four jurors testified that from what they had heard about the case, they thought the defendant was guilty. However, they also stated that they could put aside their opinions and decide the case upon the evidence presented. Further questioning revealed that two of the jurors, Mr. Mason and Mr. Olomon, stated they would require the defendant to present some evidence to overcome their opinions. Mr. Mason was questioned by the court further in the presence of Mr. Olomon. He stated that he believed in the presumption of innocence and would not hold what he had heard about the case against the defendant. Although originally uncertain, he stated that if no evidence was presented against the defendant he would return a verdict of not guilty.

Mr. Olomon was questioned along the same lines. He also stated he would not require the defendant to prove anything and that he would disregard what he had heard outside the courtroom. At the

conclusion of the court's *voir dire*, both jurors were challenged for cause. Mr. Mason was excused but Mr. Olomon was not. The defendant then used one of his peremptory challenges to excuse Mr. Olomon. The defendant ultimately exhausted his peremptory challenges.

The right to a trial by a fair and impartial jury is inviolable and guaranteed by the United States and Illinois State constitutions. (U.S. Const. amend. VI; Ill. Const. 1970, art. I, §8.) Where the exposure of the defendant or the facts of the case to the public has been extensive, the possibility of a fair trial is significantly reduced, and due process of law has therefore been compromised. It should be noted, however, that the mere existence of news accounts of the crime or the subsequent trial does not raise a presumption that the jury is prejudiced. (R. Ruebner, Illinois Criminal Procedure 253 (1987).) Although the jury must decide the case on the basis of the evidence presented during the trial and not on information received from outside sources, total ignorance of the case is not required. What is required is assurance from a juror that he or she will be able to set aside all information he or she has acquired outside the courtroom, as well as any opinions formed, and decide the case strictly on the evidence. *People v. Taylor* (1984), 101 Ill. 2d 377, 462 N.E.2d 478.

■ ■ There is no simple test to determine juror impartiality in every case. (101 Ill. 2d 377, 391, 462 N.E.2d 478, 484.) It is incumbent upon the trial judge to conduct a meaningful examination to determine whether newspaper articles or headlines or the electronic media have created a predisposition in the minds of the jurors. (R. Ruebner, Illinois Criminal Procedure 253 (1987).) However, the right to a fair trial is of such importance, that on review, an appellate court must examine the record to determine independently whether the defendant received a fair trial. (*Irvin v. Dowd* (1961), 366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639; *People v. Yonder* (1969), 44 Ill. 2d 376, 256 N.E.2d 321.) On the totality of the record in this case, we are satisfied that the trial court conducted a meaningful and thorough *voir dire* and that it was not error to deny the challenge for cause as to prospective juror Olomon.

■ Next we consider Santamaria's contention that he was denied a fair trial based on prosecutorial misconduct on cross-examination. In an attempt to prove the State's theory of premeditation, the prosecutor asked Santamaria if he had gone to another town to look for a container. Santamaria stated that he had gone some place to look for a container for dog feces. The prosecutor then asked, "And then you went to a vault company—is that correct—a burial vault company?" The defendant objected and moved for a mistrial. The ob-

jection was sustained, the jury was instructed to disregard the term "burial vault," but the motion for mistrial was denied.

It is common practice, and a generally accepted principle, that the cross-examiner may go beyond the scope of direct examination to impeach the witness. (*People v. Mason* (1963), 28 Ill. 2d 396, 192 N.E.2d 835 (widest latitude allowed on cross-examination to establish witness' bias).) The cross-examiner may question the witness about any matter that explains, modifies, or discredits what he or she said on direct examination. Leading questions are proper, but the cross-examiner should not inject unsupported insinuations into the questioning process. The cross-examiner should not ask questions unless he or she is able and ready to produce evidence to contradict a denial from the witness. R. Ruebner, Illinois Criminal Trial Evidence 96 (1987).

In this case, the prosecutor, through an offer of proof, stated that he was prepared to call the owners of the Farmington Wilbert Vault Company. The couple apparently notified the State that Santamaria had contacted them during the first week of August and inquired about purchasing a septic tank, a cement grave box, and well tiles. The trial court ultimately ruled that all testimony on the matter of the visit to the vault company would be stricken because the State failed to establish whether it occurred before or after the homicide.

■■ While it is improper for the State to make unsupported insinuations of misconduct on cross-examination without supporting evidence in response to a denial of that misconduct, reversal is required only where insinuations are substantial, repeated, and definitely prejudicial. (*People v. Jurczak* (1986), 147 Ill. App. 3d 206, 497 N.E.2d 1332.) We find no reversible error in this case. There was only one mention of the words "burial vault" and defense counsel made a prompt and timely objection to the reference, which was sustained by the trial court. Further, after the offer of proof was refused, the trial court had all testimony stricken from the record and admonished the jury to disregard all testimony concerning the incident.

■ The final issue we address is Santamaria's sentencing. Santamaria contends that the trial court abused its discretion in sentencing him to natural life imprisonment for the murder. He asserts that the trial court improperly considered the factor of causing serious bodily injury as an aggravating factor because it is inherent in every murder. Additionally, he contends that the court failed to consider, as mitigating factors, his life accomplishments and the fact that the conduct arose out of circumstances unlikely to recur.

The trial court is normally the proper forum in which a suitable

sentence is to be determined. Further, the trial court's decision in regard to sentencing is entitled to great deference and weight. Absent an abuse of discretion, a sentence may not be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) At the outset of this portion of our discussion, we note that section 1005—8—1(a)(1) of the Unified Code of Corrections provides for an extended-term sentence for murder "if the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." Under such circumstances, "the court may sentence the defendant to a term of natural life imprisonment." Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1).

■■ ■ To insure that the sentence was proper, section 1005—4—1(c) of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 1005—4—1(c)) requires the trial judge to specify on the record the reasons that led to his or her sentencing. Although this section was interpreted as being directory rather than mandatory (see *People v. Davis* (1982), 93 Ill. 2d 155, 442 N.E.2d 855), that statute was complied with in this case. The trial court noted all the factors which the defendant has mentioned as well as the allegedly improper factor of serious bodily harm. However, the trial court's reference to serious bodily injury did not mean that it used it as an additional aggravating factor. Rather, the court's statements at the sentencing hearing established only that the court was invoking the statute authorizing the imposition of the natural life sentence rather than improperly considering the serious harm to the victim as an aggravating factor. (See *People v. Fenderson* (1987), 157 Ill. App. 3d 537, 510 N.E.2d 479.) In view of the defendant's conduct in this case, we find no error in the trial court's sentencing determination.

For the foregoing reasons, the judgment of the circuit court of Knox County is affirmed.

Affirmed.

BARRY, P.J., and HEIPLE, J., concur.