NOTICE: Under Supreme Court Rule 367 a party has 21 days after

the filing of the opinion to request a rehearing. Also, opinions

are subject to modification, correction or withdrawal at anytime

prior to issuance of the mandate by the Clerk of the Court.

Therefore, because the following slip opinion is being made

available prior to the Court's final action in this matter, it

cannot be considered the final decision of the Court. The

official copy of the following opinion will be published by the

Supreme Court's Reporter of Decisions in the Official Reports

advance sheets following final action by the Court.

                                    

                Docket No. 79162--Agenda 2--January 1997.

        THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RAYMOND

                           BURGESS, Appellant.

                      Opinion filed April 24, 1997.

          JUSTICE MILLER delivered the opinion of the court:

          The defendant, Raymond Burgess, was convicted of first

degree murder and aggravated battery of a child following a jury

trial in the circuit court of Henry County. At a separate

sentencing hearing the same jury found the defendant eligible for

the death penalty and further determined that there were no

mitigating circumstances sufficient to preclude imposition of that

sentence. The defendant was accordingly sentenced to death for his

conviction for first degree murder, and he received a sentence of

30 years' imprisonment for the aggravated battery conviction. The

defendant's execution has been stayed pending direct review of the

case by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d

Rs. 603, 609(a).

          The evidence presented at trial may be stated briefly.

The defendant brought the victim, 3½-year-old Matthew Mote, to

Illini Hospital, in Silvis, around 5 p.m. on September 24, 1994.

Emergency room personnel attempted to resuscitate the child, but

their efforts were unsuccessful. The attending physician, Dr. Scott

Ludwig, and the emergency room nurses, Jane Keag and Kelly Miller,

noticed a substantial number of bruises on the child's body, and

law enforcement authorities were notified because of the nature of

the child's injuries.

          The defendant agreed to talk to the officers. In his

initial statements, the defendant explained that he and the child

were alone beginning around noon that day, when the child's mother,

Deena Kent, left the residence. According to the defendant, Matthew

soiled his pants several times. On what turned out to be the last

occasion, the defendant cleaned up the victim, bathed him, and

dressed him in clean clothes. The defendant said that he then left

the victim in his bedroom, where he was playing, while the

defendant went to his own bedroom to watch television. Sometime

later, the defendant went to the other bedroom to check on the

child. The defendant said that he found the boy lying under the box

spring of the bed, which had apparently collapsed on him. The

defendant told the officers that he then tried to resuscitate the

child but was unsuccessful. The defendant carried Matthew to the

car and picked up the child's mother at another location. The

defendant then drove to the hospital to seek treatment for the

child.

          The defendant initially denied hitting or striking the

victim. In response to further questioning, however, the defendant

admitted to officers that he had punched the victim several times.

In a written statement, the defendant explained that as he was

cleaning up Matthew, the child threw feces at him, and the

defendant told officers that he then punched the child several

times in the stomach. The defendant continued to maintain, however,

that he left the child in his bedroom to play after the bath, and

that sometime later he found the child lying under the box spring.

The defendant told the officers that injuries to the victim's

rectal area could have been caused by a rubber spatula the

defendant used to clean the child. The defendant denied sexually

penetrating Matthew.

          Police officers searched the defendant's residence, in

Green Rock. In the child's bedroom they found the box spring

partially off the bed frame, but they noticed toy cars sitting on

the railing of the frame, dust on the cars and bed frame, and

cobwebs around the frame and the spring. All this suggested to the

officers that the box spring had been in that condition for some

time. In the bathroom, officers found a rubber spatula, which was

clean. The State also introduced testimony from a number of persons

who witnessed prior acts of abuse by the defendant toward the

victim.

          An autopsy was conducted on September 25, 1994, by Dr.

Mary Jumbelic at Proctor Hospital, in Peoria. Dr. Jumbelic found

evidence of 120 separate injuries to the victim's body. The

injuries were primarily bruises, and they were located on the

child's face, head, neck, chest, abdomen, genital area, back,

buttocks, and arms and legs. One particularly large bruise was

found on the child's abdomen. An internal examination revealed that

the child had sustained a tear to his liver and to his mesentery.

Dr. Jumbelic concluded that the victim died as a result of

extensive internal bleeding, in both the cranial and abdominal

regions, caused by blunt trauma. Dr. Jumbelic believed that the

victim could not have survived more than an hour after incurring

the injuries, and that the injuries were not the result of

accident.

          The autopsy report and photographic evidence in the case

were also examined by Dr. Lori Frasier, who testified as an expert

in the area of child abuse. Dr. Frasier, a pediatrician, was an

assistant professor and director of the child protection and

advocacy program at the University of Missouri, Columbia. From her

analysis, Dr. Frasier concluded that the victim died as a result of

child abuse.

          The defense presented testimony from a number of

witnesses who described acts of abuse by the child's mother, Deena

Kent, toward her son. The defendant also testified at trial. He

recounted the events occurring on the day of Matthew's death, and

he described his efforts to clean the child after Matthew had

soiled his underwear. The defendant said that on the day of the

child's death, Matthew had fallen from a stool, had fallen down

stairs, had fallen out of a tree, had gotten into a fight with two

other boys, and had fallen in the bathtub. The defendant admitted

that he had punched the child several times, but he denied causing

the victim's death.

          In rebuttal, one of the investigating officers testified

that the defendant had not said, during questioning, that Matthew

had fallen down stairs or from a tree or had been in a fight with

other children.

          At the close of evidence, the jury found the defendant

guilty of two counts of first degree murder and one count of

aggravated battery of a child. The matter then proceeded to a

capital sentencing hearing. At the first stage of the hearing, the

State presented additional evidence showing that the victim's anus

was dilated when he was brought to the emergency room and,

moreover, that human seminal fluid was present in the anal cavity.

The State sought to establish the defendant's eligibility for the

death penalty on the basis of two independent statutory aggravating

circumstances: commission of the murder in the course of another

felony, in this case, aggravated criminal sexual assault, and the

murder of a child in a brutal and heinous manner (720 ILCS 5/9--

1(b)(6), (b)(7) (West 1994)). At the conclusion of the first stage

of the hearing, the jury found the existence of both statutory

aggravating circumstances.

          At the second stage of the capital sentencing hearing,

the State presented testimony of previous acts of violence

committed by the defendant. A woman who had formerly lived with the

defendant described two incidents in which the defendant had

threatened her with a handgun. One of the woman's two daughters

corroborated her mother's account and also testified that the

defendant had often spanked her sister. In addition, the parties

stipulated that the defendant was convicted of first degree forgery

in Georgia in 1987 and received a sentence of three years'

probation for that offense.

          In mitigation, the defendant presented favorable

testimony from a number of persons, including former neighbors of

the defendant, a former employer, and the defendant's father. These

persons described the defendant as helpful and generous and said

that the defendant was kind to children.

          At the conclusion of the sentencing hearing, the jury

found that there were no mitigating circumstances sufficient to

preclude imposition of the death penalty. Accordingly, the trial

judge sentenced the defendant to death. The judge later sentenced

the defendant to an extended term of 30 years' imprisonment on his

conviction for aggravated battery of a child.

                                     I

          Following the submission of the defendant's initial

brief, this court granted the defendant's motion to stay the normal

briefing schedule and to remand the cause to the circuit court of

Henry County for a supplementary hearing. According to the order

granting the motion, this was done for the "limited purpose of

determining whether defendant ingested psychotropic medication at

or near the time of his trial and sentencing." Our order further

stated, "The circuit court shall conduct such proceedings as it

deems necessary and report its findings to this court within 60

days of this order." The trial judge conducted the hearing in March

1996 and later submitted written findings to us. Before this court,

the parties have submitted briefs on the issues raised by the

remand proceeding, as well as on issues pertaining to the

defendant's trial and sentencing hearing.

          The evidence presented at the hearing revealed that Dr.

Robert Edwalds, a psychiatrist, prescribed three different drugs

for the defendant--doxepin, trazodone, and lorazepam--all of which

are classified as psychotropic agents. Dr. Edwalds prescribed these

drugs to assist the defendant in sleeping. According to records

maintained by the Henry County jail, the defendant received a

single dose of doxepin at bedtime on a daily basis from October 21,

1994, to December 10, 1994. The defendant received a single dose of

trazodone at bedtime on a daily basis from November 4, 1994, until

March 28, 1995. The defendant received a single dose of lorazepam

at bedtime on a daily basis from January 13, 1995, until February

22, 1995, and again from March 8, 1995, until March 27, 1995. Jury

selection began on March 6, 1995, and the parties gave their

opening statements on March 10, 1995. The defendant's capital

sentencing hearing concluded on March 21, 1995.

          Relying on People v. Brandon, 162 Ill. 2d 450 (1994), and

its progeny, the defendant argues that he is now entitled to a new

trial. The defendant notes that he was receiving psychotropic drugs

at the time of his trial and sentencing hearing in this case yet

did not then receive a hearing into his fitness, which Brandon and

subsequent cases have held was required by a statute in force at

the time of the earlier proceedings, section 104--21(a) of the Code

of Criminal Procedure of 1963 (725 ILCS 5/104--21(a) (West 1994)).

The State contends that evidence presented at the hearing on remand

clearly demonstrates that the psychotropic drugs ingested by the

defendant had no effect on his mental condition during the earlier

proceedings.

          Dr. Edwalds testified at the hearing on remand that he

prescribed three different drugs for the defendant because of the

defendant's complaints that the first two were not effective. Dr.

Edwalds believed that the drugs would not have had any effect on

the defendant's mental condition the following day, given their

dosages and the time at night at which they were taken. It appears

from the record that Dr. Edwalds had not intended for the different

drugs to be taken simultaneously, but that the jailers

inadvertently gave the defendant both doxepin and trazodone for a

period, and later both trazodone and lorazepam. The defendant was

receiving both trazodone and lorazepam at the time of his trial and

sentencing hearing. Nonetheless, Dr. Edwalds did not believe that

the two drugs, even when taken in combination, would have produced

any psychotropic effect on the defendant the following day. Dr.

Edwalds noted that the two medications are frequently taken

together.

          Robert Streight, the jail administrator, testified that

he saw the defendant numerous times each day. Streight said that

the defendant always seemed alert and normal; Streight did not

observe any change in the defendant's demeanor during his period of

incarceration. According to Streight, jailers had secretly observed

that the defendant would begin shaking when he heard them approach

and would cease to shake after they had walked by.

          Dr. Linda Gruenberg, a psychiatrist, testified in the

defendant's behalf at the hearing on remand. Dr. Gruenberg did not

believe that doxepin could have had any effect on the defendant

during trial or sentencing, for the defendant ceased taking it long

before trial began. Dr. Gruenberg also did not believe that the

defendant would have been affected by lorazepam, which the

defendant was taking during the trial and sentencing hearing. Dr.

Gruenberg explained that the defendant's bedtime dose of lorazepam,

an antianxiety drug, would not have had any significant effect on

his mental state the next day. Dr. Gruenberg believed, however,

that the defendant could have been affected by the doses he was

receiving of trazodone. Dr. Gruenberg said that the drug, an

antidepressant that is also prescribed as a sleep aid, was being

given to the defendant in amounts that would be sufficient to treat

depression. Dr. Edwalds' notes indicated that the defendant was

receiving 300 to 450 milligrams of trazodone each night, which Dr.

Gruenberg described as a therapeutic dose of that drug for

treatment of depression. She believed that a dose sufficient for

sleeping would be smaller, ranging from 50 to 150 milligrams.

          The defense also presented testimony from the defendant's

father, Jess Burgess, who said that he noted a marked change in the

defendant's demeanor and behavior after the defendant was in jail.

Jess Burgess said that, during visits with his son at the jail, the

defendant became hostile and experienced difficulty concentrating.

Jess Burgess said that his son was neat and clean shaven before his

arrest but became disheveled and unkempt afterwards, and that his

son's residence was generally clean.

          In rebuttal, the State introduced testimony from the

defendant's trial attorney, Raymond Conklin. Over the defendant's

objection that Conklin's testimony would violate the attorney-

client privilege, Conklin stated that the defendant had been able

to assist him in the preparation and presentation of a defense to

the charge in this case. Without relating the contents of any

conversations with the defendant, counsel said that the defendant

discussed all aspects of the trial with him, including voir dire,

the selection of defense witnesses, and the choice of questions for

prosecution and defense witnesses. Counsel further stated that the

defendant always appeared to be alert and coherent.

          An additional rebuttal witness, Julianne Redington,

testified that she was frequently at the defendant's home during

the summer 1994 in her capacity as a visiting nurse. Redington

described the house as filthy and said that the defendant was

unkempt.

          The trial judge later entered written findings. The judge

concluded that the medications given to the defendant in jail each

night at bedtime would not have had any psychotropic effect on the

defendant the following day. The judge noted that he presided at

trial and sentencing and that on all occasions the defendant

appeared alert. Relying on his own observations from the earlier

proceedings, the judge stated that the defendant "assisted in jury

selection and actively participated in his defense, communicated

frequently with counsel, wrote notes, and asked questions during

recess of counsel and the judge."

          The judge further noted that he had not been aware during

the earlier proceedings of the defendant's use of the psychotropic

medications. The judge stated:

               "The defendant never exhibited any obvious side

               effects such as drowsiness, lack of memory,

               inattentiveness or lack of appropriate gait at any

               time during the proceedings. The defendant never

               appeared to have any change in mood or demeanor and

               freely related his physical condition (which

               included bouts with diarrhea during the first two

               days of jury selection), to the court. No

               statements or actions by the defendant indicated

               any mental disfunctioning or disability, or any

               issue regarding fitness."

The trial judge concluded that the drugs received by the defendant

had no effect on the defendant's "mental functioning, mood or

demeanor in the courtroom."

          The State acknowledges that under our decisions in People

v. Brandon, 162 Ill. 2d 450 (1994), People v. Gevas, 166 Ill. 2d

461 (1995), People v. Kinkead, 168 Ill. 2d 394 (1995), People v.

Birdsall, 172 Ill. 2d 464 (1996), and People v. Nitz, 173 Ill. 2d

151 (1996), this court could simply grant the present defendant a

new trial, without regard to his actual condition at the time of

the proceedings below, given his ingestion of psychotropic drugs

during the trial and sentencing hearing. The State argues, however,

that we should not invoke the practice of automatic reversal in

this case, in light of the evidence revealed at the special

supplemental hearing.

          We agree with the State that a rule of automatic reversal

is not always appropriate. As this case demonstrates, there will be

some circumstances in which it can be said that the use of

psychotropic medication did not affect the defendant's mental

functioning in such a way that relief would be appropriate. We are

aware that we have previously declined to make use of retrospective

fitness hearings, noting the difficulty in determining, long after

the conclusion of the underlying proceedings, the degree of mental

functioning enjoyed then by the defendant. See People v. Birdsall,

172 Ill. 2d 464, 476 (1996) (citing Brandon and Gevas).

Nonetheless, we believe that, at least in the present case, there

are sufficient reasons to depart from our previous practice of

automatic reversal and to make a case-specific inquiry into the

psychotropic drugs administered to this particular defendant.

          Our decision to consider the possible effects of the

drugs on the defendant finds support in the testimony of the

defendant's expert witness at the supplemental hearing. Dr. Linda

Gruenberg believed that neither doxepin nor lorazepam could have

had any effect on the defendant. She noted that the defendant had

discontinued taking doxepin months before trial, and that

lorazepam, which the defendant took at bedtime during the course of

the trial, would have dissipated overnight. As Dr. Gruenberg's

testimony demonstrates, we should not automatically assume that

every psychotropic drug will inevitably render the person taking it

unfit for purposes of trial or sentencing, and we therefore

conclude that retrospective hearings are sometimes proper. The

evidence in this case, including the prescribing doctor's

testimony, the judge's observations, and the defendant's own

testimony at trial, compels the conclusion that the defendant was

suffering no impairment as a result of his ingestion of

psychotropic drugs during the time of his trial and sentencing

hearing.

          The defendant argues, however, that the scope of the

supplemental hearing held in this case exceeded the limited purpose

expressed in this court's remand order. At the outset of the

hearing, in response to a motion in limine filed by the defendant,

in which the defendant sought to restrict the evidence that the

State could introduce at the hearing, the State argued that a full

hearing should be held, and that the proceeding should not be

limited to determining simply what drugs defendant was taking when,

but also the effects of the drugs prescribed to the defendant. In

support of this broad inquiry, the State cited People v. Kinkead,

168 Ill. 2d 394, 414-15 (1995), in which this court noted that the

record in that case left a number of questions unanswered: "We

cannot reliably ascertain from the record when defendant began to

take Thorazine, the amount prescribed, the medical reasons it was

prescribed for him, or in what manner the drug might have

influenced defendant's mental functioning, mood, and demeanor in

the courtroom."

          Although our order remanding the cause to the trial court

might not have fully anticipated the range of testimony introduced

at the hearing, we do not believe that we should ignore the

evidence that was presented on remand. Prior to the hearing, the

defendant was made aware of the scope of the hearing; at that time,

the trial judge denied a motion in limine by the defense that

sought to preclude the State from presenting testimony on the

possible effects of the drugs prescribed in this case. The

defendant was able to participate fully in the ensuing proceedings

and, further, was granted funds for the purpose of retaining his

own expert witness, Dr. Gruenberg, to provide testimony regarding

the effects of the drugs involved here.

          The defendant raises the additional contention that the

testimony given by his trial counsel at the hearing on remand

violated the attorney-client privilege. The defendant maintains

that the privilege was not waived by his raising the fitness issue.

See People v. Knuckles, 165 Ill. 2d 125 (1995). We agree with the

defendant that at least some parts of trial counsel's testimony at

the remand hearing were given, over trial counsel's own objection,

in violation of the defendant's attorney-client privilege. Although

counsel, relying on his observations of his client, could freely

testify to the defendant's demeanor (People v. Williams, 97 Ill. 2d

252, 293-95 (1983)), counsel could not base his assessment of the

defendant's mental condition on privileged communications made by

the defendant in the course of the attorney-client relationship. 81

Am. Jur. 2d Witnesses §§401, 402 (1992). We have accordingly

limited our consideration of counsel's testimony to those portions

that do not violate the attorney-client privilege; we note that the

trial judge's findings do not appear to rely on that testimony.

          In light of our decision here, we need not consider the

State's alternative argument that a recently amended version of the

psychotropic drug statute, section 104--21(a) of the Code of

Criminal Procedure of 1963 (725 ILCS 5/104--21(a) (West Supp.

1995)) controls the present appeal and that the defendant is not

entitled to any relief under the new provision. Cf. People v.

Birdsall, 172 Ill. 2d 464, 475 n.1 (1996) (summarily stating that

amended statute not applicable in that case).

          In a separate argument, the defendant contends that he

was unfit to stand trial because he was suffering from stomach

cramps and diarrhea during jury selection. The defendant notes his

comment to the judge during voir dire that he was having difficulty

concentrating on the case. In addition, as further evidence of his

inability to assist his trial attorney, the defendant notes that

questioning of prospective jurors continued during several of his

many trips to the restroom.

          The defendant failed to raise this issue at trial. In any

event, the evidence in the record does not present a bona fide

doubt of the defendant's fitness, necessary to trigger his right to

a fitness hearing under section 104--11 of the Code of Criminal

Procedure of 1963 (725 ILCS 5/104--11 (West 1994)). In addition, a

review of the transcript reveals that the defendant expressly chose

to go forward with the proceedings, and did not want to delay them,

despite his complaint about not being able to concentrate. On only

three occasions did any voir dire examination occur while the

defendant was absent. At those times, the trial judge did not

immediately realize that the defendant had absented himself from

the proceedings; once the judge became aware of the defendant's

absence, the trial judge ceased questioning the prospective jurors

and waited for the defendant to return. Upon the defendant's

return, the trial judge repeated to the defendant what had occurred

in his absence. We find nothing in this case to suggest that the

defendant was unfit for trial, was unable to understand the process

of selecting a jury, or was otherwise unable to assist his

attorney.

          The defendant next argues that the trial judge abused his

discretion in allowing the State to introduce, over a defense

objection, evidence of prior acts of abuse committed by the

defendant against the victim.

          Evidence of prior acts of misconduct is admissible if

relevant for some purpose other than to show a propensity for

crime, and if the probative value of the evidence outweighs its

prejudicial effect. See People v. Illgen, 145 Ill. 2d 353, 364-65

(1991); People v. McKibbins, 96 Ill. 2d 176, 182 (1983). A trial

judge's decision allowing the introduction of evidence of this

nature will be upheld on review unless the ruling represents an

abuse of discretion. People v. Phillips, 127 Ill. 2d 499, 522

(1989).

          As an initial matter, we must reject the defendant's

argument that this evidence was not sufficiently probative because,

the defendant says, none of the witnesses actually saw the

defendant commit any act of abuse toward the victim. We note that

the defendant did not make this objection in the proceedings below

in opposition to the introduction of this testimony. In any event,

we do not agree with the defendant's characterization of the

evidence as lacking probative value or of the defendant's conduct

as nonabusive. One witness, Mary Martin, testified that in late

July 1994 she saw the defendant grab a dog leash, fold it over, and

walk into the victim's bedroom. Martin then heard the sound of

something being hit and heard the victim cry out. Martin heard 5 to

10 strikes in all. Moments later, the defendant left the child's

bedroom, slammed the leash on a table, and told the child's mother

to use the leash in the future. Martin afterwards saw fresh welts

from the top of the victim's back down to his legs.

          Another witness, Margaret Miller, testified that in July

or August 1994 she saw the defendant spank the victim on the

bottom, leaving signs of his handprints on the child's skin. This

witness also saw the defendant push the victim into a corner,

causing him to hit the wall. A neighbor, Debra Donovan, testified

that sometime after the victim and his mother moved in with the

defendant in June 1994, she saw the defendant kick Matthew, causing

the child's legs to fly off the ground. Allen Williamson, who lived

in the defendant's residence for one or two months that summer,

said that the defendant would spank the child four or five times a

day. Williamson stated that the defendant generally took Matthew to

another room for that purpose, but the witness said that he could

hear the child crying.

          We cannot say that the trial judge in the present case

abused his discretion in allowing the prosecution to introduce the

evidence of the defendant's prior acts of abuse. The defense theory

at trial was that the three-year-old victim sustained a series of

accidental injuries on the day of his death. Although the defendant

admitted striking the child several times during that afternoon, he

denied that those blows were deadly, and he claimed that the fatal

injury was caused by the accidental collapse of a box spring on the

child. To counter the defense theory, the prosecution appropriately

sought to present evidence of prior acts of abuse committed by the

defendant against the victim, to show the presence of intent and

the absence of accident. See People v. Oaks, 169 Ill. 2d 409, 453-

55 (1996); People v. Lucas, 132 Ill. 2d 399, 429 (1989); People v.

Platter, 89 Ill. App. 3d 803, 820-22 (1980). Although the earlier

instances of abuse were not in all respects like the fatal injuries

to the child's abdomen and head, only general similarities between

the different acts are necessary when such evidence is offered

simply to show an absence of an innocent frame of mind, or the

presence of criminal intent. Oaks, 169 Ill. 2d at 454; Illgen, 145

Ill. 2d at 373.

          In further opposition to this evidence, the defendant

notes that the victim's mother, Deena Kent, was also abusive toward

the victim. We do not believe, however, that evidence of Kent's

misconduct alters the admissibility of testimony detailing the

defendant's own prior acts of abuse. We conclude that the testimony

of these witnesses was properly admitted.

          The defendant, in his last contention relating to the

guilt phase of the proceedings, argues that error occurred in the

introduction of testimony from two expert witnesses that the

numerous bruises incurred by the victim in this case were not

consistent with accidental injuries. Defense counsel made no

objection to these portions of the testimony of Dr. Jumbelic and

Dr. Frasier, nor did counsel raise the issue in the defendant's

post-judgment motion. To surmount the effects of the waiver, the

defendant also argues that the admission of the testimony was plain

error and, further, that defense counsel was ineffective for

failing to object to it.

          This court's recent opinion in People v. Oaks, 169 Ill.

2d 409, 460-62 (1996), is dispositive of the defendant's challenge

to this evidence. In Oaks, we found no error in a physician's

testimony that a child's death was not accidentally caused. The

witness at issue in Oaks was, incidentally, one of the witnesses in

this case whose testimony the present defendant challenges. In

sustaining the opinion testimony offered by Dr. Frasier in that

case, the Oaks court explained:

               "This court has stated that, generally, an

               individual will be permitted to testify as an

               expert if his experience and qualifications afford

               him knowledge which is not common to lay persons

               and where such testimony will aid the trier of fact

               in reaching its conclusion. (People v. Enis (1990),

               139 Ill. 2d 264, 288; People v. Jordan (1984), 103

               Ill. 2d 192, 208.) In this case, we conclude that

               the lay jury needed the expert testimony of Dr.

               Frasier to determine whether, based on their

               severity, the victim's injuries were caused

               intentionally or accidentally." Oaks, 169 Ill. 2d

               at 461.

          As in Oaks, one of the issues in the present case was

whether the victim's injuries occurred accidentally, as the

defendant claimed. Dr. Jumbelic and Dr. Frasier were qualified as

experts on this subject, and the matter on which they testified was

outside the jury s range of competence. See Oaks, 169 Ill. 2d at

461. We find no error in the introduction of their testimony.

          Finally, we decline the defendant's invitation to

overrule Oaks. Contrary to the defendant's contention, there is no

inconsistency between Oaks and our cases barring the introduction,

at a death penalty hearing, of expert testimony on the deterrent

value of capital punishment. The death penalty is an authorized

sentence in Illinois, and testimony regarding its efficacy would

not be relevant to the decision made by the sentencer. People v.

Williams, 97 Ill. 2d 252, 300-01 (1983).

                                    II

          The defendant next raises a series of challenges to the

capital sentencing hearing conducted in this case. The defendant

first argues that his trial attorney rendered ineffective

assistance when he in essence conceded his client's eligibility for

the death penalty under one of the two statutory aggravating

circumstances alleged by the States.

          At the first stage of the bifurcated sentencing hearing,

the State sought to qualify the defendant for the death penalty

under two separate statutory aggravating circumstances: murder in

the course of a specified felony, in this case, criminal sexual

assault (720 ILCS 5/9--1(b)(6) (West 1994)), and murder of child in

a brutal and heinous manner (720 ILCS 5/9--1(b)(7) (West 1994)).

          The defendant complains that his trial attorney

challenged only the application of section 9--1(b)(6), and did not

contest, and even conceded, the defendant's eligibility under

section 9--1(b)(7). As evidence of counsel's ineffectiveness, the

defendant cites a number of comments made by trial counsel in

opening statement and closing argument at the first stage of the

sentencing hearing. In opening statement counsel told the jury that

the defendant "may well qualify for the death penalty" and that he

"may well be eligible" for that sentence. Later, in closing

argument, defense counsel stated:

               "If you want to, or as you consider all the

               evidence, I'll tell you that if you so desire

               there's enough evidence that you can find the

               murder was, or the death was, resulted from brutal

               and heinous behavior, but I want to talk to you

               about the other [statutory aggravating

               circumstance] for a while."

Defense counsel then challenged the prosecution's evidence that a

sexual assault had occurred.

          A claim of ineffective assistance of counsel is generally

measured against the two-part standard announced by the United

States Supreme Court in Strickland v. Washington, 466 U.S. 668,

687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). To

succeed on a claim of ineffective assistance under Strickland, a

defendant must establish both that counsel's performance was

deficient and that the deficiency proved to be prejudicial.

Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at

2064. Judicial scrutiny of counsel's performance is highly

deferential under Strickland, and a court considering an

ineffectiveness claim "must indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable

professional assistance." Strickland, 466 U.S. at 689, 80 L. Ed. 2d

at 694, 104 S. Ct. at 2065. To establish prejudice resulting from

an asserted deficiency in counsel's performance, "[t]he defendant

must show that there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would

have been different. A reasonable probability is a probability

sufficient to undermine confidence in the outcome." Strickland, 466

U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

          Only in a few instances will prejudice be presumed,

making a separate inquiry into prejudice unnecessary. See United

States v. Cronic, 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039

(1984). In Cronic the Supreme Court noted that when "counsel

entirely fails to subject the prosecution's case to meaningful

adversarial testing, then there has been a denial of Sixth

Amendment rights that makes the adversary process itself

presumptively unreliable." Cronic, 466 U.S. at 659, 80 L. Ed. 2d at

668, 104 S. Ct. at 2047. In those circumstance prejudice to a

defendant may be presumed. Strickland, 466 U.S. at 692, 80 L. Ed.

2d at 696, 104 S. Ct. at 2067. The defendant believes that this is

such a case, citing People v. Hattery, 109 Ill. 2d 449 (1985), in

which this court presumed that the defendant was prejudiced by

trial counsel's representation. In Hattery, counsel conceded, in

opening statement, his client's guilt to murder charges, introduced

no evidence at trial, and failed to make a closing argument to the

jury. The present defendant argues that a presumption of prejudice

is necessary in this case, noting that there is no possible

strategic value in being found eligible under one, rather than two,

aggravating circumstances.

          We believe that the present case is more similar to

People v. Rissley, 165 Ill. 2d 364 (1995), than it is to Hattery.

Defense counsel in Rissley conceded the defendant's eligibility for

the death penalty under section 9--1(b)(6) but sought to challenge

the applicability of section 9--1(b)(7), the reverse of the

situation here. This court found that counsel's conduct did not

amount to plain error and noted that "defense counsel's apparent

concession regarding eligibility under section 9--1(b)(6) came in

the context of mounting a more pointed challenge against

eligibility under section 9--1(b)(7)." Rissley, 165 Ill. 2d at 397.

          At trial, counsel had challenged the prosecution's theory

of the case, and the defendant had provided the jury with his own

account of the events leading up to the victim's death. The jury

rejected the defense contentions, however. When the sentencing

hearing convened, defense counsel apparently believed that he could

possibly defeat one of the aggravating circumstances but not the

other, and that he would lose credibility with the jury if he

attempted to argue that the 120 injuries sustained by the victim

were not the result of brutal and heinous behavior. Notwithstanding

the comments cited by the defendant, counsel's closing argument at

the first stage of the hearing reminded the jury of the State s

evidentiary burden in establishing either aggravating circumstance,

and defense counsel argued further that there was no presumption

that the defendant was eligible for the death penalty.

          For these reasons, we believe that Hattery is

inapplicable here. See People v. Johnson, 128 Ill. 2d 253, 269-71

(1989). The present defendant, if he is to prevail on his claim of

ineffective assistance, must therefore establish both a deficiency

in counsel's performance and prejudice resulting from the asserted

deficiency. Failure to establish either proposition will prove

fatal to the claim. Strickland, 466 U.S. at 697, 80 L. Ed. 2d at

699, 104 S. Ct. at 2069; People v. Harris, 164 Ill. 2d 322, 349

(1994). In applying the Strickland standard, a reviewing court

"need not determine whether counsel's performance was deficient

before examining the prejudice suffered by the defendant as a

result of the alleged deficiencies." Strickland, 466 U.S. at 697,

80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

          We are unable to conclude that counsel's alleged

deficiency had any effect on the outcome of the first stage of the

sentencing hearing. Under the prejudice inquiry, "An error by

counsel, even if professionally unreasonable, does not warrant

setting aside the judgment of a criminal proceeding if the error

had no effect on the judgment." Strickland, 466 U.S. at 691, 80 L.

Ed. 2d at 696, 104 S. Ct. at 2066. The evidence of the defendant's

eligibility under section 9--1(b)(7) was overwhelming, and we do

not believe that there is a reasonable probability that the result

of the first stage of the sentencing hearing would have been

different if counsel had challenged the defendant's qualification

for the death penalty under section 9--1(b)(7). That provision

renders a capital defendant eligible for the death penalty if "the

murdered individual was under 12 years of age and the death

resulted from exceptionally brutal or heinous behavior indicative

of wanton cruelty." 720 ILCS 5/9--1(b)(7) (West 1994). The jury had

already found the defendant guilty of the first degree murder of

the child. Both Dr. Mary Jumbelic and Dr. Lori Frasier had

testified that the victim's numerous injuries were not incurred

accidentally, and the jury had rejected the defendant's claim that

the child died as a result of an accident. Dr. Frasier had further

testified that the severe injuries sustained by the victim were

comparable to those that a child would incur if he were to fall 20

feet onto a concrete surface, or were to be thrown from an

automobile in a collision. On this record, we conclude that the

remarks of counsel challenged here had no effect on the jury's

decision to find the defendant eligible for the death penalty under

section 9--1(b)(7).

          In an additional contention related to the brutal and

heinous aggravating circumstance found in section 9--1(b)(7), the

defendant briefly argues that trial counsel was ineffective for

failing to make any challenge to the constitutionality of that

provision. The defendant asserts that the terms of the statute are

unconstitutionally vague. See Maynard v. Cartwright, 486 U.S. 356,

100 L. Ed. 2d 372, 108 S. Ct. 1853 (1988).

          The present argument assumes, of course, that the

provision is constitutionally infirm and therefore susceptible to

challenge. This court has previously determined that the

aggravating circumstance set forth in section 9--1(b)(7) passes

constitutional muster, however, when it is coupled with a limiting

construction, and the defendant makes no challenge to the limiting

construction provided to the sentencing jury in the present case.

          A limiting construction may save a statutory aggravating

circumstance that must otherwise be considered unconstitutionally

vague under the eighth amendment. See Arave v. Creech, 507 U.S.

463, 471, 123 L. Ed. 2d 188, 198, 113 S. Ct. 1534, 1541 (1993)

("Unlike the Court of Appeals, we do not believe it is necessary to

decide whether the statutory phrase `utter disregard for human

life' itself passes constitutional muster. The Idaho Supreme Court

has adopted a limiting construction, and we believe that

construction meets constitutional requirements"); Walton v.

Arizona, 497 U.S. 639, 654, 111 L. Ed. 2d 511, 529, 110 S. Ct.

3047, 3057 (1990) ("In this case there is no serious argument that

Arizona's `especially heinous, cruel or depraved' aggravating

factor is not facially vague. But the Arizona Supreme Court has

sought to give substance to the operative terms, and we find that

its construction meets constitutional requirements").

          In People v. Lucas, 132 Ill. 2d 399, 444 (1989), the

court agreed with the defendant's argument that section 9--1(b)(7)

"was unconstitutionally applied in his case because his conduct did

not rise to the level of `exceptionally brutal or heinous'

behavior." In resolving that question, the court looked to case law

and dictionary definitions of the relevant terms and noted that

"[c]ases in which this court has found brutal or heinous behavior

to be present have generally involved prolonged pain, torture or

premeditation." Lucas, 132 Ill. 2d at 445. The court found that the

defendant's actions did not meet any of those criteria, and the

court thus concluded that the defendant was not eligible for the

death penalty on the basis of the "exceptionally brutal"

aggravating circumstance contained in section 9--1(b)(7).

          Later, in People v. Tye, 141 Ill. 2d 1 (1990), and in

People v. Fair, 159 Ill. 2d 51 (1994), this court undertook a

similar analysis, measuring the actions of the defendants in those

cases against the definitions that had been formulated in Lucas. In

both Tye and Fair the court concluded that the defendants had acted

with the requisite brutality and upheld the determinations that the

defendants were eligible for the death penalty under section 9--

1(b)(7).

          In the present case, the trial judge specifically

instructed the jury on the meanings of the terms used in section 9-

-1(b)(7). See Illinois Pattern Jury Instructions, Criminal, No.

7B.07 (3d ed. Supp. 1996). The defendant has not challenged the

definitions contained in the pattern instructions and given to the

jurors in this case. Because the defendant has not established the

predicate for an ineffective-assistance claim, we need not consider

this issue further.

          In his next series of arguments, the defendant raises

several challenges to the prosecutor's closing argument at the

second stage of the capital sentencing hearing. The defendant first

complains of the following comment, made by the prosecutor in

summation:

               "This defendant referred to Matthew at one time

               during his testimony as the kid that died. He's

               never said he's sorry. You heard his father

               testify, and I asked him if he ever said he's

               sorry. He's never said that. He's cold. He's evil.

               He's devoid of mercy, compassion. He's devoid of

               human values."

Defense counsel did not object to the preceding remarks or raise

the issue in the defendant's post-judgment motion. The defendant

now contends that the prosecutor's comments violated his fifth

amendment privilege against compelled self-incrimination.

Acknowledging counsel's procedural default of the issue, the

defendant asks that we consider this claim under the rubric of

either plain error or ineffective assistance of counsel.

          We do not agree with the defendant that the remarks made

in this case were an impermissible commentary on the defendant s

failure to incriminate himself. "This court has consistently held

that a convicted defendant s remorse or the absence of it is a

proper subject for consideration at sentencing." People v. Barrow,

133 Ill. 2d 226, 281 (1989). See also People v. Erickson, 117 Ill.

2d 271, 302 (1987); People v. Ward, 113 Ill. 2d 516, 527-32 (1986);

People v. Neal, 111 Ill. 2d 180, 196 (1985); People v. Albanese,

102 Ill. 2d 54, 80-81 (1984). The challenged remarks here derived

not from the defendant's failure or refusal to incriminate himself,

but from the manner in which the defendant referred to the child

victim in this case in his testimony, when he offhandedly described

Matthew Mote as "the kid that died," and from the testimony of the

defendant's father, who said that the defendant had not expressed

remorse for the child's death. In the present case, the prosecutor

did not specifically refer to the defendant's failure to

incriminate himself, or seek to cast the defendant s assertion of

that right in an unfavorable light. Rather, the prosecutor's

statements should be construed simply as a comment on the

defendant's apparent lack of remorse for the child's death. These

remarks were clearly related to the defendant's own testimony at

trial and to the testimony of the defendant's father at the

sentencing hearing.

          In sum, we conclude that the challenged comments were

based on the evidence presented in this case and were not

impermissible remarks on the defendant's failure to incriminate

himself. Because we have found that the prosecutor's argument was

proper, we need not consider whether plain error occurred or

whether defense counsel was ineffective for failing to preserve an

objection to the remarks.

          The defendant next complains of two further portions of

the prosecutor's closing argument at the second stage of the

sentencing hearing. The defendant contends that these comments

improperly reduced the jury's sense of responsibility for the

decision it was being asked to make. In summation, the prosecutor

stated:

                    "I didn't choose to be here. And you didn't

               choose to be here. There's only one person that's

               responsible for us being here today. He wrote the

               book. He wrote the story. He wrote all the plays

               and he alone is responsible. Ray Burgess wrote this

               story, the story that's brought us together to do

               what we have to do."

Later, in rebuttal, the prosecutor stated:

                    "I made the decision in this case to go for

               the death penalty on behalf of the People of the

               State of Illinois. But there's only one person and

               one person only that has to shoulder any blame for

               anything that happened here today or anything

               that's going to happen. And that's Ray Burgess.

               He's the only person that needs to take

               responsibility for what he did and for what is

               going to happen to him."

          The defendant contends that the preceding comments

violated Caldwell v. Mississippi, 472 U.S. 320, 86 L. Ed. 2d 231,

105 S. Ct. 2633 (1985), by minimizing the jury's role in the

capital sentencing process. In Caldwell the Supreme Court found

constitutional error in a prosecutor's argument, to which defense

objections were overruled, that a decision by the jury to impose

the death penalty would not be final because it would be subject to

judicial review. In the present case, defense counsel did not

object to these portions of the prosecutor's closing argument or

raise the issue in the post-judgment motion. The defendant

therefore contends that the prosecutor's remarks amounted to plain

error and, further, that trial counsel was ineffective for failing

to preserve this issue.

          Regarding the specific comments challenged here, the

defendant contends that he could not have been literally

responsible for convening the sentencing hearing because only the

State may request one. Further, the defendant believes that the

comment on the prosecutor's decision to seek the death penalty

impermissibly evinces a shared sense of responsibility for that

sentence. Finally, the defendant contends that the references to

his responsibility for the hearing would have improperly diminished

the jury's sense of its own duty.

          The parties are allowed wide latitude in closing

argument, and comments of counsel must be evaluated in the context

in which they were made. See People v. Flores, 153 Ill. 2d 264, 289

(1992); People v. Fields, 135 Ill. 2d 18, 62, 64 (1990). We do not

believe that the remarks challenged here would have improperly

affected the jury's understanding of its unique part in the capital

sentencing process. Considering the prosecutor's remarks in

context, we believe that the jurors would have understood them

simply as a comment on the evidence in the case and the chain of

circumstances that led to the sentencing hearing, and not as a

literal description of the law governing the jury's role or

determination. See People v. Cole, 172 Ill. 2d 85, 112-13 (1996);

People v. Page, 155 Ill. 2d 232, 280-82 (1993). In the course of

his remarks, the prosecutor reviewed the evidence in aggravation

and mitigation and spoke of the part played by the jury in the

sentencing process. The prosecutor noted on several occasions that

the decision the jury was required to make was a difficult one. At

the conclusion of the hearing, the trial judge correctly instructed

the jury on its responsibilities, as well as on the purpose of

closing argument. We do not believe that the jury would have

interpreted the prosecutor's comments as contradicting those

instructions, or that the jury was otherwise misled regarding its

true role in the sentencing process. See People v. Pasch, 152 Ill.

2d 133, 204-06 (1992). Accordingly, we need not determine whether

plain error occurred, or whether defense counsel was ineffective

for failing to object to the prosecutor's remarks.

          The defendant alleges one further instance of misconduct

by the State during closing argument at the second stage of the

sentencing hearing. The defendant cites the following comments by

the prosecutor in summation:

               "[Matthew Mote] didn't have a choice whether he was

               going to live or die because he had no control over

               the situation. The only person who had a choice on

               September 24 was Ray Burgess and he made it. He's

               had all his rights guaranteed. He had a right to

               trial by jury. He's got a right to an eligibility

               hearing. He's got a right to a sentencing hearing,

               got a right to be represented by an attorney and

               have his day in court."

The prosecutor went on to say that justice would be served in this

case if the jury returned a sentence of death. The defendant argues

that the preceding comments denied him due process and violated

each of the separate rights enumerated by the prosecutor. In this

regard, the defendant correctly notes that an offender may not

receive a more severe punishment simply because he has chosen to

invoke his constitutional rights. See United States v. Jackson, 390

U.S. 570, 20 L. Ed. 2d 138, 88 S. Ct. 1209 (1968).

          The jury was already aware, of course, that the defendant

possessed the constitutional and statutory rights listed by the

prosecutor. The defendant construes the preceding comments,

however, as an attempt to inflame the jury by contrasting the

defendant, and the rights he enjoyed, with the young victim, who

did not have the benefit of those same procedural safeguards before

his death. Assuming that this was the prosecutor's purpose and that

the comments were improper, we do not believe that the present

defendant may prevail on a claim of either plain error or

ineffective assistance of counsel. The plain error doctrine

represents a limited exception to the waiver rule. Contrary to the

defendant's contention, we do not believe that the question rises

to the level of plain error. See 134 Ill. 2d R. 615(a) (On review,

"[p]lain errors or defects affecting substantial rights may be

noticed although they were not brought to the attention of the

trial court"). The plain-error doctrine is appropriately invoked

when the evidence in the case is closely balanced, or when the

alleged error is so fundamental that it denies the defendant a fair

proceeding. People v. Banks, 161 Ill. 2d 119, 143 (1994); People v.

Childress, 158 Ill. 2d 275, 300 (1994); People v. Bean, 137 Ill. 2d

65, 80 (1990). We do not believe that either element has been

satisfied here. The aggravating evidence in this case was

overwhelming, consisting chiefly of the brutal circumstances of the

defendant's crimes. The comment at issue was isolated, and the

prosecutor did not emphasize the point. The claimed error was not

of such magnitude that it could have deprived the defendant of a

fair sentencing hearing.

          We must also reject the defendant's alternative argument

that trial counsel was ineffective for failing to object to the

comments challenged here. Even if counsel was deficient, the

defendant cannot establish prejudice from the alleged deficiency.

As we have noted, this portion of the prosecutor's closing argument

was brief and unrepeated, and we do not believe that it had any

effect on the jury's consideration of the aggravating and

mitigating evidence in the case, or on the jury's ultimate

determination to impose the death sentence.

                                    III

          As a final matter, the defendant raises a number of

challenges to the constitutionality of the Illinois death penalty

statute, section 9--1 of the Criminal Code of 1961 (720 ILCS 5/9--1

(West 1994)). This court has repeatedly rejected the same arguments

in the past, and the defendant provides no grounds that would

warrant our reaching a different result in this case.

          The defendant first takes issue with the requirement in

the statute that the death sentence be imposed unless there exists

mitigating evidence sufficient to preclude it. 720 ILCS 5/9--1(g),

(h) (West 1994). The defendant believes that this criterion

prevents the sentencing authority from giving full effect to

mitigating evidence introduced in a capital defendant's behalf. We

have previously rejected the same contention, finding that it

"rests on a strained interpretation of the statutory language"

(People v. Strickland, 154 Ill. 2d 489, 539 (1992)), and we adhere

to that holding. See People v. Page, 155 Ill. 2d 232, 283 (1993);

People v. Hampton, 149 Ill. 2d 71, 116-17 (1992).

          The defendant also argues that various aspects of the

death penalty statute invite the arbitrary and capricious

imposition of that sentence. We have consistently affirmed the

validity of these procedures, however, and thus have no reason to

find them cumulatively unconstitutional.

          Our cases have held that the statute is not invalid for

the discretion allowed to the prosecutor in deciding whether to

seek a sentence of death in a particular case. People v. Lewis, 88

Ill. 2d 129, 146 (1981); People ex rel. Carey v. Cousins, 77 Ill.

2d 531, 534-43 (1979). We have also held that the statute is not

invalid for failing to require the prosecution to provide the

defense with pretrial notice of its intent to seek a sentence of

death (People v. Silagy, 101 Ill. 2d 147, 161-62 (1984); People v.

Gaines, 88 Ill. 2d 342, 369 (1981)) or of pretrial notice of the

aggravating evidence to be used at a capital sentencing hearing

(People v. King, 109 Ill. 2d 514, 547 (1986); People v. Albanese,

104 Ill. 2d 504, 540 (1984); Gaines, 88 Ill. 2d at 369). Nor is the

statute invalid for not requiring the sentencer to provide a

written memorial of its findings in the case. King, 109 Ill. 2d at

550-51; People v. Stewart, 104 Ill. 2d 463, 499 (1984); People v.

Brownell, 79 Ill. 2d 508, 541-44 (1980). The death penalty statute

is not invalid for failing to impose a burden of persuasion on the

prosecution at the second stage of the hearing (People v. Jones,

123 Ill. 2d 387, 426 (1988); People v. Eddmonds, 101 Ill. 2d 44, 68

(1984); People v. Free, 94 Ill. 2d 378, 421 (1983)), and the

statute does not invalidly impose on the defense a burden of

establishing that a sentence other than death should be imposed

(People v. Fields, 135 Ill. 2d 18, 76 (1990); People v. Orange, 121

Ill. 2d 364, 390 (1988); People v. Caballero, 102 Ill. 2d 23, 49

(1984)). In those instances in which there is no mandatory

alternative to a sentence of death, there is no requirement that

the sentencing jury be informed of the various other sentences that

may be imposed. People v. Phillips, 127 Ill. 2d 499, 543 (1989);

People v. Albanese, 102 Ill. 2d 54, 81 (1984). Comparative

proportionality review is not required by the federal constitution

(Pulley v. Harris, 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871

(1984)), and the Illinois statute is not invalid for failing to

compel such review (King, 109 Ill. 2d at 551; People v. Stewart,

104 Ill. 2d 463, 499 (1984); People v. Kubat, 94 Ill. 2d 437, 502-

04 (1983). Given the extensive precedent sustaining these aspects

of the statutory scheme, we reject the defendant's argument that,

in combination, these features of the statute threaten its

arbitrary and capricious imposition. People v. Harris, 164 Ill. 2d

322, 352 (1994); People v. Pitsonbarger, 142 Ill. 2d 353, 409

(1990).

                                  *  *  *

          For the reasons stated, the judgment of the circuit court

of Henry County is affirmed. The clerk of this court is directed to

enter an order setting Tuesday, September 16, 1997, as the date on

which the sentence of death entered in the circuit court of Henry

County is to be carried out. The defendant shall be executed in the

manner provided by law (725 ILCS 5/119--5 (West 1994)). The clerk

of this court shall send a certified copy of the mandate in this

case to the Director of Corrections, to the warden of Stateville

Correctional Center, and to the warden of the institution where the

defendant is now confined.

                                                         Judgment affirmed.

          JUSTICE HARRISON, dissenting:

          Once the trial court determined on remand that defendant

was taking psychotropic drugs at the time of his trial and

sentencing, no further inquiry was authorized or appropriate. The

rule is clear and the remedy is automatic. Defendant is entitled to

a new trial under People v. Brandon, 162 Ill. 2d 450 (1994), and

the cases we have decided in accordance with Brandon.

          The trial court's decision to take additional evidence

beyond the scope of our remand instructions can only be understood

as evincing dissatisfaction by the trial court with the Brandon

rule. The court was obviously searching for a way to circumvent our

decisions, but the decisions of the supreme court are not optional,

nor are our orders. Where we issue clear and unambiguous directions

to a circuit court, those directions must be strictly followed. Any

action taken by the circuit court beyond those directions is

outside the scope of its authority and void for lack of

jurisdiction. People ex rel. Daley v. Schreier, 92 Ill. 2d 271,

276-77 (1982).

          By considering the additional evidence taken by the trial

court here, my colleagues have ignored this principle completely.

In so doing, they may have dealt a serious blow to our authority as

an institution. Our power depends on obedience to our decisions,

but if circuit courts can depart from those decisions whenever a

majority on this court considers it expedient in a particular case,

we will quickly find our power gone. Lower courts will have no

incentive to do what we have instructed them to do because they

know that, depending on the passing fancy of this court, they are

very likely to get away with it.

          In ruling as it does, the majority makes no effort at all

to distinguish this case from Brandon and its progeny. It tells us

that there are "sufficient reasons" to depart from past precedent

"at least in the present case" (slip op. at 8) but nowhere does it

give its reasons or explain what it is about this case that makes

it different. The majority simply proceeds to make an after-the-

fact assessment of defendant's fitness at the time of trial, the

very practice this court has repeatedly and consistently rejected.

People v. Gevas, 166 Ill. 2d 461, 471 (1995); People v. Birdsall,

172 Ill. 2d 464, 480 (1996).

          The only conclusion one can reasonably draw from all of

this is that the Brandon line of cases, as recent as it is, has

been suddenly and inexplicably overruled. Whatever one thinks of

the wisdom of Brandon, such action is improper. Once a principle of

law has been established by the court, the doctrine of stare

decisis dictates that it should not be discarded simply because

some members of the court disagree or have changed their minds. As

this court explained in Chicago Bar Ass'n v. Illinois State Board

of Elections, 161 Ill. 2d 502, 510 (1994):

               "The doctrine of stare decisis is the means by

               which courts ensure that the law will not merely

               change erratically, but will develop in a

               principled and intelligible fashion. Stare decisis

               permits society to presume that fundamental  

               principles are established in the law rather than

               in the proclivities of individuals."

The majority's decision today is directly contrary to these

principles. Indeed, we have no stare decisis under the majority's

opinion in this case. The doctrine is dead.

          If there is no stare decisis and if lower courts are now

free to disregard our orders, it is difficult for me to see what

practical function we serve as a court of review. One thing is sure

though. Illinois jurisprudence has seen brighter moments.

          JUSTICE FREEMAN joins in this dissent.